*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0422p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

MONROE RETAIL, INC., et al.,
　　　　　　　　　*Plaintiffs-Appellants,*

　　　　　*v.*

RBS CITIZENS, N.A., f/k/a CHARTER ONE
BANK, N.A., et al.,
　　　　　　　　　*Defendants-Appellees.*

No. 07-4263

> Appeal from the United States District Court
> for the Northern District of Ohio at Toledo.
> No. 06-02391—David A. Katz, District Judge.

Argued: September 19, 2008

Decided and Filed: December 14, 2009

Before: COLE and GIBBONS, Circuit Judges; FORESTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** William H. Bode, BODE & GRENIER, LLP, Washington, D.C., for Appellants. Kerin Lyn Kaminski, GIFFEN & KAMINSKI, Cleveland, Ohio, Keith Alexander Noreika, COVINGTON & BURLING LLP, Washington, D.C., for Appellees. **ON BRIEF:** William H. Bode, BODE & GRENIER, LLP, Washington, D.C., for Appellants. Karen Louise Giffen, GIFFEN & KAMINSKI, Cleveland, Ohio, Keith Alexander Noreika, COVINGTON & BURLING LLP, Washington, D.C., Frances F. Goins, Michael Nathan Ungar, Jason S. Hollander, ULMER & BERNE, Cleveland, Ohio, Brett K. Bacon, Gregory R. Farkas, FRANTZ WARD LLP, Cleveland, Ohio, for Appellees.

　　　GIBBONS, J., delivered the opinion of the court, in which FORESTER, D.J., joined. COLE, J. (pp. 16-21), delivered a separate dissenting opinion.

_____

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiffs-appellants Monroe Retail, Inc.; Jerome Phillips, Esq.; and Leo Marks, Inc. ("the Garnishors") appeal the district court's dismissal of their claim against defendants-appellees RBS Citizens, N.A. (formerly known as Charter One Bank, N.A.); The Huntington National Bank; Huntington Bancshares, Inc.; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Keybank, N.A.; Keycorp, National City Bank; National City Corporation; Sky Bank; U.S. Bank, N.A.; and U.S. Bancorp ("the Banks").  The Garnishors brought suit against the Banks for conversion, alleging that the Banks unlawfully used garnished funds to satisfy service fees to the Banks.  For the reasons below, we affirm the dismissal of the Garnishors' claim.

**I.**

The relevant facts are not in dispute.  The Garnishors are garnishor-creditors in Ohio who obtain judgments against debtors when debts are not repaid.  The Garnishors often collect these judgments by garnishing the debtors' bank accounts.  Ohio Revised Code ("ORC") § 2716.12 provides that a garnishment action must be accompanied by a one dollar fee to the garnishee, in this case, the Banks who hold the debtors' funds in customer accounts.  The Banks charge an additional $25 to $80 service fee to the debtors for the garnishment process.  When debtors have insufficient funds to satisfy both the service fee and the garnishment order, the Banks extract the service fees from the garnished funds before releasing the remainder of the funds to the Garnishors.

The Garnishors filed a class action suit against the Banks[1] in the Court of Common Pleas of Lucas County, Ohio, on August 31, 2006, alleging three causes of

---

[1]The Garnishors originally filed suit against Fifth Third Bank as well.  However, Fifth Third Bank filed a motion for summary judgment, arguing that it had been erroneously included as a defendant since it did not subtract service fees from garnished funds.  The Garnishors voluntarily dismissed Fifth Third Bank as a defendant.

action against the Banks. First, the Garnishors claimed that the service fees charged by the Banks amount to additional garnishment fees beyond the one dollar fee authorized by ORC § 2716.12 and therefore violate that section, causing the Garnishors to have lost at least $5,000,000. Second, the Garnishors claimed that by deducting these service fees, the Banks were illegally converting funds belonging to the Garnishors for their own use in violation of the garnishment process prescribed by ORC § 2716.13(B) and § 2716.21(D). Third, the Garnishors sought injunctive relief to prevent the Banks from continuing to deduct service fees from funds in the debtors' accounts. The Banks all responded by filing dispositive motions.

Defendants The Huntington National Bank; Huntington Bancshares Inc.; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; National City Bank; National City Corporation; U.S. Bank N.A.; and U.S. Bancorp ("Removing Defendants") timely filed a notice of removal on October 3, 2006. The case was removed to the United States District Court for the Northern District of Ohio. The Removing Defendants filed a motion for judgment on the pleadings on January 19, 2007. Defendants Charter One Bank and Sky Bank also filed motions for judgment on the pleadings. Defendants KeyBank and KeyCorp filed a motion to dismiss. In their various motions, the Banks claimed, *inter alia*, that 1) the Garnishors lacked standing; 2) the Banks were not proper defendants; 3) ORC § 2716.12 unambiguously permits additional fees beyond one dollar; and 4) the Garnishors' claims are preempted by federal banking law. KeyBank, KeyCorp, and Sky Bank, the sole state bank defendant, additionally claimed that 5) the Banks have a right to "set off" an account-holder's debt to the Banks, including service fees, against the account-holder's debt to the Garnishor.

On September 18, 2007, the district court held that 1) the Garnishors had standing because they suffered actual injuries; and 2) the Garnishors met their pleading burden to show that the Banks should be defendants. The district court dismissed the Garnishors' complaint on the remaining grounds, concluding that 3) ORC § 2716.12's plain meaning "contains no clear limitation on additional garnishment charges"; 4) the National Banking Act preempts the Garnishors' claims as to national banks but not as

to state banks; and 5) the Banks have a right to set off service fees against bank accounts before remitting the remaining funds to the Garnishors. *Monroe Retail, Inc. v. Charter One Bank, N.A.*, __ F. Supp. 2d __, No. 3:06 CV 2391, 2007 WL 2769645 (N.D. Ohio Sept. 18, 2007). The district court noted that its finding that the National Banking Act preempted state regulation of bank fees was consistent with the Officer of the Comptroller of the Currency's interpretation of its own regulations.

The Garnishors timely appealed. In their final reply brief, the Garnishors withdrew their claim that the Banks had violated ORC § 2716.12. Thus the only substantive issue on appeal before us is the Garnishors' conversion claim.

## II.

We review a district court's determination of standing *de novo*. *See Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009). "Every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)). The issue of standing was thoroughly discussed by the district court, and neither party raised the issue on appeal. Nevertheless, "a merits question cannot be given priority over an Article III question," *id.* at 97 n.2, and we must begin by addressing standing. In order to bring suit, the Garnishors must have standing as required both by Article III of the United States Constitution and by the doctrine of prudential standing. *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).

In order to establish Article III standing, the Garnishors "must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." *Coyne ex rel. Ohio v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). Phrased succinctly, the "'irreducible minimum' . . . requirements for standing are proof of injury in fact, causation, and redressability." *Id.* The Garnishors claim that by receiving garnishment funds that have been reduced by the Banks' service fees, the Garnishors have suffered

actual injuries. This loss is an injury in fact that could be redressed by compensating the Garnishors for their economic losses. *See id*. We thus affirm the district court's finding that the Garnishors have established standing under Article III.

"Once [the Garnishors] allege[] an injury-in-fact that is fairly traceable to the actions of [the Banks, the Garnishors] must show that [they] ha[ve] met the prudential standing requirements." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 295 (6th Cir. 2006). In order to satisfy prudential standing, the Garnishors' claims must 1) "assert [their] own legal rights and interests," 2) be more than a "generalized grievance," and, 3) in statutory cases, "fall within the zone of interests regulated by the statute in question." *Wuliger*, 567 F.3d at 793 (internal citation and quotation marks omitted). The Garnishors have asserted their own legal rights and interests in receiving the full amount of the garnished funds pursuant to lawfully obtained judgments. The fact that the service fees are initially charged to debtors does not negate the fact that their collection by the Banks affects the rights and interests of the Garnishors. Furthermore, the Garnishors pled a particular grievance involving the specific garnishment process undertaken by the Banks with regards to debtors' insufficient garnishment funds. Lastly, the Garnishors have withdrawn their statutory claim, so this requirement is no longer applicable. The Garnishors have demonstrated that they are "proper proponent[s], and the action a proper vehicle, to vindicate the rights asserted." *Id.* (internal citation and quotation marks omitted). We thus find that the Garnishors have established prudential standing, and we proceed to merits of their claims.

**III.**

We review *de novo* a district court's grant of judgment on the pleadings. *See Hughlett v. Romer-Sensky*, 497 F.3d 557, 561 (6th Cir. 2006). We grant a party's motion for judgment on the pleadings when "all well-pleaded material allegations of the pleadings of the opposing party [are] taken as true, and . . . the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted). There

must be no material issue of fact that could prevent judgment for the moving party. *Id.* at 582. "The standard of review for a judgment on the pleadings is the same as that for a motion to dismiss under Federal Rule of Procedure 12(b)(6)." *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001). We thus review the Banks' various motions for judgment on the pleadings and motions to dismiss under the same *de novo* standard.

Because the Garnishors have withdrawn their claim that the Banks violated ORC § 2716.12, the only issue before us is whether the Garnishors' conversion claim can survive a motion for judgment on the pleadings and a motion to dismiss.[2] The Garnishors claim that the Banks have wrongfully converted $25 to $80 per garnishment to their own use in violation of ORC § 2716.13(B)[3] and ORC § 2716.21(D).[4] These regulations state that garnishees, including banks, become liable to the Garnishors "at the time the garnishee is served with the [garnishment] order." ORC § 2716.21(D). The Garnishors interpret these regulations to require the Banks to relinquish debtors' funds before deducting service fees for the garnishment process. The Banks argue that the

---

[2]The district court did not address the Garnishors' request for an injunction, presumably because after it dismissed the Garnishors' claims, the injunction was a moot issue. The Garnishors have not raised their request for an injunction on appeal and have therefore waived the issue. *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008). Even if they had not waived the issue, their request for an injunction remains moot because we affirm the dismissal of the Garnishors' claims.

[3]The pertinent language in ORC § 2716.13(B) states: "The [garnishment] order shall bind the property in excess of four hundred dollars, other than personal earnings, of the judgment debtor in the possession of the garnishee at the time of service."

[4]The text of ORC § 2716.21(D) provides:

A garnishee shall pay the personal earnings owed to the judgment debtor or the money or value of the property or credits, other than personal earnings, of the judgment debtor in the garnishee's possession or under the garnishee's control at the time of service of the order of garnishment, or so much thereof as the court orders, into court. The garnishee shall be discharged from liability to the judgment debtor for money so paid and shall not be subjected to costs beyond those caused by the garnishee's resistance of the claims against the garnishee. A garnishee is liable to the judgment creditor for all money, property, and credits, other than personal earnings, of the judgment debtor in the garnishee's possession or under the garnishee's control or for all personal earnings due from the garnishee to the judgment debtor, whichever is applicable, at the time the garnishee is served with the order under section 2716.05 or 2716.13 of the Revised Code.

Garnishors do not state a claim because the National Bank Act, 12 U.S.C. § 24 (Seventh) ("NBA"), permits them to charge fees and preempts any claim to the contrary.[5]

Ordinarily, a presumption against preemption applies. *See United States v. Locke*, 529 U.S. 89, 108 (2000); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). In the context of national banking, however, the Supreme Court has held that the general presumption against preemption does not apply. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007); *Locke*, 529 U.S. at 108 ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996).

The Banks were created pursuant to federal legislation, namely, the NBA. The NBA authorizes national banks to "exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). The Officer of the Comptroller of the Currency ("OCC"), which has regulatory and supervisory power over national banks, has issued regulations defining the "incidental powers" a national bank may exercise without state interference. *See, e.g.*, *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-58 (1995). The OCC's interpretation of the NBA is entitled to substantial deference:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The [OCC] is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to [its] deliberative conclusions as to the meaning of these laws.

*Clarke v. Secs. Indus. Ass'n*, 479 U.S 388, 403-04 (1987) (citation omitted) (quoting *Investment Co. Institute v. Camp*, 401 U.S. 617, 626-27 (1971), and collecting cases).

---

[5]The Garnishors brought claims against both national and state banks before the district court. The Huntington National Bank; JPMorgan Chase Bank, N.A.; Keybank N.A.; Keycorp; National City Bank; U.S. Bank N.A.; and Charter One are national banks, and Sky Bank was a state bank. As noted at oral argument, however, Huntington Bancshares has since acquired Sky Bank. Therefore, all of the defendants are now national banks, and we need not bifurcate the analysis.

The OCC has specifically defined the ability to charge fees as an "incidental power" of a national bank. The OCC promulgated § 7.4002(a) of Title 12 of the Code of Federal Regulations, which gives national banks explicit "[a]uthority to impose charges and fees." 12 C.F.R. § 7.4002(a). Both parties have stipulated that the Banks have authority pursuant to such federal regulation to charge contractual fees to their customers. They disagree, however, as to whether the NBA's grant of authority to charge fees includes the service fees for the garnishment process and preempts the Garnishors' conversion claim.

The Banks contend that the NBA permits them to charge the Garnishors the service fees when debtors have insufficient funds in their accounts to satisfy the fees. According to the OCC's regulations, a national bank is authorized to "charge its customers non-interest charges and fees, including deposit account service charges." *Id.* The Banks argue that this language permits them to collect service fees from debtors' accounts, even if the funds in the accounts are subject to garnishment by the Garnishors. In response, the Garnishors argue that their right to the funds is protected by Ohio's garnishment statute, *see* ORC §§ 2716.13(B), 2716.21(D), and that Ohio garnishment law is explicitly exempt from preemption and the Banks' broad authority under 12 C.F.R. § 7.4007(c)(4), which exempts state laws governing the "rights to collect debts" from preemption. The Banks contend that this language exempts only state laws governing the *Banks*' rights to collect debts from preemption, not the Garnishors' rights, and further argue that any interpretation of Ohio debt collection law that would allow the Garnishors' claim to proceed is preempted by the NBA.

We find that the NBA does not preempt general state laws governing the rights of all entities, not just Banks, to collect debts; but we conclude that the Garnishors' specific conversion claim pursuant to the Ohio garnishment statute is nevertheless preempted by the NBA's grant of authority to the Banks to charge and collect fees.

## A. *"Rights to Collect Debts"*

The OCC has promulgated regulations that save certain areas of state law from general preemption by the NBA. The first question before us is whether the NBA saves all state laws governing "rights to collect debts" from preemption, or, as the Banks contend, merely laws governing the Banks' rights to collect debts. The text of the pertinent regulation states:

> State laws that are not preempted. State laws on the following subjects are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers:
>
> (1) Contracts;
> (2) Torts;
> (3) Criminal law;
> (4) Rights to collect debts;
> (5) Acquisition and transfer of property;
> (6) Taxation;
> (7) Zoning;
> (8) Any other law the effect of which the OCC determines to be incidental to the deposit-taking operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section.

12 C.F.R. § 7.4007(c) (footnote omitted).

The Banks claim that this language clearly refers only to the Banks' rights to collect debts and thus that all other laws governing the rights to collect debts, including ORC § 2716.13(B) and § 2716.21(D), are preempted by the NBA. In support of their opinion, the Banks solicited an opinion letter from the OCC in interpreting whether "rights to collect debts" involved service fees charged for the garnishment process. Assuming that the "rights to collect debts" referred to the Banks' rights, the OCC declared that this exemption was not implicated by the garnishment process because the service fees did not constitute "debts." "This provision [exempting "rights to collect debts"] is not relevant to the current circumstances. . . . Thus, 12 C.F.R. § 7.4007(c)(4) pertains to a bank's right to recover a debt, not to the means the bank uses to pursue that right." OCC Interp. Letter (Jan. 18, 2007) (Removing Defs. Br. Attach. C) ("OCC

Interp. Letter (Jan 18, 2007)") (emphasis omitted).  The OCC did not address whether the NBA preempts *all* laws regarding rights to collect debts.

The OCC opinion letter was not issued through notice and comment rule-making. Generally, opinion letters are analyzed under *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  "[W]hile not controlling upon the courts by reason of [its] authority," we give an interpretation weight "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*  The Banks urge us to apply a higher level of deference to the OCC's letter, relying on the Supreme Court's comment in *United States v. Mead*, that "as significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded."  533 U.S. 218, 230-31 (2001) (citing *NationsBank of N.C.*, 513 U.S. at 256-57, 263).

In this case, however, the Banks have provided us no reason to afford the OCC's interpretation regarding "rights to collect debts" a higher level of deference.  First, it is not clear that the OCC's letter represents its opinion on the matter because it never addressed whether the NBA preempts general state law governing other parties' rights to collect debts.  Second, to the extent the letter is an opinion that all state law governing debts is preempted except for laws governing the Banks' "rights to collect debts," the Banks, as well as the OCC, have cited no case law to support this proposition.  In fact, both the Banks and the OCC argue simply that the service fee owed to the Banks is not a debt.  This argument misses the point – the Garnishors claim that it is *their* right to collect *their* debts that falls into the exemption.

Regardless of whether the specific language of 12 C.F.R. § 7.4007(c) refers solely to the Banks' rights under state law, nowhere does the NBA purport to preempt state laws governing all other entities' rights.  Indeed, the policy behind reserving these areas of law to the states is precisely that they are laws of general applicability that do

*not* target banks. Bank Activities and Operations, 69 Fed. Reg. 1904, 1912 & n.60 (Jan. 13, 2004). The Banks have taken the presumption of preemption to an illogical extreme. Their suggestion that the exemption only pertains to banks' rights under state law to debt collection would create an inconsistent and erroneous result: The Banks' rights to collect debts would be governed by state law and would not be preempted, but the Banks themselves would not be required to comply with state laws in enforcing the rights of others to collect debts. The Banks' narrow reading would render the language either inconsistent, as mentioned above, or superfluous. It defies common sense to think that without this explicit reservation, the NBA would preempt the right of creditors, or even banks alone, to collect debts. Indeed, under the Banks' interpretation, no one but national banks would be subject to tort law because the law as applied to every other entity would be preempted by the NBA. We thus reject the Banks' narrow interpretation, and the OCC's letter to the extent it espouses this interpretation, and find that the NBA does not preempt general state debt collection laws, including those regulating both banks' and others' rights to collect debts.

## B. Banks' Authority to Charge Fees

This finding, however, does not end our inquiry. We must now examine whether the Garnishors' specific conversion claim pursuant to Ohio's garnishment statute is preempted. As mentioned above, state laws, including those governing "rights to collect debts," are only exempted from preemption "to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers." 12 C.F.R. § 7.4002(c)(4). The Supreme Court has held that states may not "prevent or significantly interfere with the national bank's exercise of its powers." *Barnett Bank*, 517 U.S. at 33. When state laws "significantly impair the exercise of authority, enumerated or incidental under the NBA," the state laws "must give way." *Watters*, 550 U.S. at 12. We have found that the level of "interference" that gives rise to preemption under the NBA is not very high. *See Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 409 (6th Cir. 2001) (rejecting as

"unpersuasive" an "attempt to redefine 'significantly interfere' as 'effectively thwart'").**6** Although the Garnishors have withdrawn their statutory claim, the Banks argue that any interpretation of Ohio's garnishment laws that would allow the Garnishors' conversion claim to proceed would interfere with their ability to collect fees, as authorized by 12 C.F.R. § 7.4002(a), and is thus preempted.

The Banks also solicited the OCC's opinion on this matter. In its same opinion letter, the OCC declared that the service fee for the garnishment process was a "fee" within the meaning of 12 C.F.R. § 7.4002 and therefore that the Banks were authorized to collect these fees. OCC Interp. Letter (Jan. 18, 2007). Attendant to this authority to charge fees is the authority and discretion to determine the amount and method of charging those fees. *See* 12 C.F.R. § 7.4002(b)(2) ("The establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles."). By preventing the banks from exacting a fee for processing the garnishment orders through freezing the accounts, the Ohio garnishment laws "significantly interfere" with this fundamental national bank function by *de facto* mandating a $1 fee and the method by which that fee is extracted.

Moreover, the OCC stated that a "bank's authorization to establish fees pursuant to § 7.4002(a) includes the authorization to determine the order in which the fees are posted to a depositor's account." *Id*. As explained by the OCC, "[t]he garnishment fee and the Bank's process of debiting it first are intended to reduce the Bank's costs and compensate the Bank for other potential risks in connection with the legal requirement to process garnishments served on the Bank." *Id*. Accordingly, if the Banks are authorized to charge the service fee and similarly authorized to post the service fee in

---

**6**The dissent's reliance on *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), and *McClellan v. Chipman*, 164 U.S. 347 (1896), is misplaced because the statutes at issue in those cases imposed no burden whatsoever on national banks. *See Luckett*, 321 U.S. at 248 ("Under the statute, the state merely acquires the right to demand payment of the accounts in the place of the depositors. Upon payment of the deposits to the state, the bank's obligation is discharged."); *McClellan*, 164 U.S. at 359–60 (finding that the state law prevented banks from engaging in contracts that were unlawful under state contract law and did not at all prevent banks from generally taking real estate as collateral as permitted by national banking laws).

whatever order they determine, the OCC argued that the Banks are consequently authorized to collect the service fee even if this process has the effect of reducing the funds that the Garnishors receive: "We further confirm that the Bank is authorized by section 24(Seventh) and section 7.4002 to debit the garnishment fee from an account prior to remitting funds to the garnishor." *Id.*

We find this argument persuasive. The requirement that banks freeze accounts immediately upon receipt of a garnishment order is unduly burdensome on national banks because it mandates the order in which those banks carry out their daily account-balancing and account-management functions. The OCC has consistently interpreted § 7.4002(a) as including the authorization to determine the order in which banks may post fees to an account. *See, e.g.*, OCC Interp. Letter No. 1082, 2007 WL 3341502, at *2 (May 17, 2007); OCC Interp. Letter No. 933, 2002 WL 31955273, at *4 (August 17, 2001). Likewise, we note that this proposition is consistent with Ohio law, which grants state banks the power to decide that "items may be accepted, paid, certified, or charged to the indicated account of its customer in any order." Ohio Rev. Code, § 1304.29(B).

We find the OCC's interpretation sensible as it permits the Banks to complete the daily account-balancing tasks that all banks must undertake, both as a general operational matter and specifically in the context of responding to a garnishment notice served on debtors' accounts. The Garnishors cite the Ohio garnishment statute, which states that garnishees are liable "at the time of service of the order" of garnishment. ORC § 2716.21(D). Relying on this statutory language, the Garnishors claim that Ohio law requires the Banks to freeze the funds in the debtors' accounts at the time of service of the garnishment order and thus that Ohio law prohibits them from further deducting service fees after receiving the garnishment order. We agree with the Banks that the Garnishors' contention that the Banks must immediately "freeze" the garnished accounts is overly simplistic as the Banks must first undertake a number of procedures to assess what funds are available to be garnished.

Thus the Garnishors' interpretation would allow ORC § 2716.13(B) and § 2716.21(D) to "significantly interfere" not only with the Banks' ability to collect and

set their service fees, but also with the Banks' federal authority to complete other transactions and balance their accounts. *See Duryee*, 270 F.3d at 409. We therefore find that any interpretation of the Ohio garnishment statute that would allow the Garnishors' claim to proceed is preempted by the NBA's grant of authority to the Banks to collect fees without interference. The Garnishors have thus failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6), (c).

## C. Setoffs

The district court found that even if the Garnishors' claims were not preempted, the Garnishors' claims should be dismissed because the Banks have a right to "set off" the service fee against the garnished funds before releasing the remainder of the funds to the Garnishors. Although the issue of setoffs is not necessary to our holding, we vacate the district court's invocation of the doctrine of setoff because the doctrine is applicable only to debts.

In their appellate briefs, the Banks and Garnishors all agree that the service fees are not "setoffs." (Charter One's Br. 18) ("Charter One's Assessment of Fees Is Not a "Setoff"); (Removing Def.'s Br. 26) ("Plaintiffs' arguments are based on the flawed premise that the doctrine of 'setoff' applies."); (KeyBank, N.A., and KeyCorp's Br. 20) ("There is a fundamental difference in the bank's charging internal processing fees to its customers pursuant to its account agreement, and the rules of traditional debitor / creditor setoff"); (Pl.'s Br. 19) ("The Banks Concede Their Seizure of Garnished Funds Is Not a Setoff").[7] The district court, without explaining its reasoning, found to the contrary: "The parties address this issue passingly, so this Court finds it sufficient to note that, in light of the long history of the practice and the fact that the legislature failed to explicitly exclude it, § 2716.12 is not intended to interfere with the common law right of setoff." *Monroe Retail, Inc.*, 2007 WL 2769645, at \*6. The district court nevertheless

---

[7]KeyBank, N.A., KeyCorp, and Sky Bank were the only defendants to argue before the district court that the rules of setoff apply. KeyBank, N.A., and KeyCorp have since changed their position to align with that of the other defendants and the OCC, (KeyBank, N.A., and KeyCorp's Br. 20) ("There is a fundamental difference in the bank's charging internal processing fees to its customers pursuant to its account agreement, and the rules of traditional debitor / creditor setoff"), and Sky Bank is no longer a party. Therefore there is no longer any party arguing that the doctrine of setoff should apply.

found this issue dispositive: "This Court grants [the Banks'] motions to dismiss on the basis of the language of section 2716.12 and the preservation of [Banks'] right to set-off." *Id*. at \*7.

As defined by the Ohio Supreme Court, the common law right of setoff is "an extrajudicial self-help remedy based on general principles of equity" that "allows a bank to apply general deposits of a depositor against a depositor's matured debt." *Daugherty v. Cent. Trust Co. of Ne. Ohio, N.A.*, 504 N.E.2d 1100, 1104 (Ohio 1986). In other words, setoff "is that right which exists between two parties, each of whom under an independent contract owes a definite amount to the other, to set off their respective debts by way of mutual deduction." *Walter v. Nat'l City Bank of Cleveland*, 330 N.E.2d 425, 525 (Ohio 1975). The doctrine of setoff only applies when banks use customers' funds to satisfy an "independent contract" and external debt to the bank. *Pruitt v. LGR Trucking, Inc.*, 774 N.E.2d 273, 277-78 (Ohio App. 2002). By contrast, the dispute in this case centers on whether the Banks can satisfy a customer's service fee by reducing the same, internal account by that amount before releasing the remaining funds to the Garnishors. We thus vacate the district court's characterization of service fees as setoffs. *See id*. (finding that the principle of setoff did not apply because the debts were not based on independent contracts).

**IV.**

For the foregoing reasons, we affirm the dismissal of the Garnishors' claim on the ground that the NBA preempts their conversion allegations.

---

**DISSENT**

---

COLE, Circuit Judge, dissenting. The majority concludes that the National Bank Act, ("NBA"), and the regulation promulgated under it that allows national banks to collect fees for account services, 12 C.F.R. § 7.4002(a), preempt Ohio's garnishment law, ORC § 2716.13(B) and § 2716.21(D). I disagree. The garnishment law at issue is a law of general applicability that only incidentally affects national banks, with negligible effect on their ability to perform their business. Both Supreme Court precedent and the plain language of the OCC regulation's savings clause strongly suggest that preemption is inappropriate here.

**A.      Supreme Court precedent clearly weighs against preemption**

The majority opinion rests on several cases that it claims support a finding of preemption, but it does not discuss the substance of those cases, nor does it address the two Supreme Court decisions on which Monroe Retail principally relies. The cases cited by the majority do not weigh in favor of preemption here because those cases involved much more significant intrusions into the business of national banks—intrusions that bear little resemblance to the Ohio statute before us. On the other hand, the cases cited by Monroe Retail dealt with state statutes similar to Ohio's garnishment law, and both held those statutes not to be preempted by national banking laws.

The majority relies on *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 21 (2007), in which the Court held that state regulators could not exercise corporate visitorial powers, such as the right to inspect books and records, over national banks' operating subsidiaries. The state conceded that the NBA preempts state visitorial powers over the national banks themselves, but claimed that the same was not true of bank subsidiaries (specifically at issue were subsidiaries in the mortgage-lending business). *Id.* at 15. The Court disagreed and held that the NBA preempted the state from exercising its visitorial powers over the subsidiaries: "[S]tate regulators cannot interfere with the 'business of banking' by subjecting national banks or their OCC-licensed operating subsidiaries to

multiple audits and surveillance under rival oversight regimes." *Id*. at 21.  Thus, the intrusion into the business of banking at issue in *Watters*—"multiple audits [by state regulators] and surveillance under rival oversight regimes"—was far more significant than Ohio's garnishment law.

The majority also relies on *Barnett Bank of Marion County, N.A. v. Nelson*, but there, the state law at issue prohibited most national banks from selling insurance in small towns in the state.  517 U.S. 25, 29 (1996) ("[T]he State Statute says, in essence, that banks cannot sell insurance in Florida – except that an *unaffiliated* small town bank (*i.e.*, a bank that is not affiliated with a bank holding company) may sell insurance in a small town.").  However, a federal statute gave national banks that very power.  *Id*. at 28 (describing the Act of Sept. 7, 1916, 39 Stat. 753, as amended, 12 U.S.C. § 92, which provides that certain national banks may sell insurance in small towns).  Accordingly, the Court found that the state statute "'st[ood] as an obstacle to the accomplishment' of one of the Federal Statute's purposes," and was therefore preempted.  *Id.* at 31 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  The Court clarified:

> In defining the pre-emptive scope of statutes and regulations granting a power to national banks, [our past] cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted.  To say this is not to deprive States of the power to regulate national banks, where (unlike here) doing so does not *prevent or significantly interfere with the national bank's exercise of its powers*.

*Id*. at 33 (emphasis added).  As with *Watters*, the state statute in *Barnett*, which barred national banks from engaging in a whole sector of business, was of a completely different nature from the garnishment statute before us.  *See also Franklin Nat'l Bank v. New York*, 347 U.S. 373, 377-78 (1954) (holding that federal statutes authorizing national banks to receive savings deposits preempted New York law barring non-state-chartered banks from using the word "savings" in advertising, since the law interfered with the banks' "right to let the public know about" a business in which federal law permitted them to engage).

The majority also relies on a prior case from this Circuit, *Association of Banks in Insurance, Inc. v. Duryee*, in which the state law at issue was an Ohio statute allowing the superintendent of insurance to deny or revoke an insurance license upon determining that the insurer's "principal purpose" has been to sell insurance to certain categories of customers.  270 F.3d 397, 406-08 (6th Cir. 2001).  The statute was enacted as a consumer protection measure to "prevent an unfair advantage in the placing of insurance and the licensing of persons who were not intending to do a general insurance business, but simply to supplement their primary business."  *Id.* at 408 (internal quotations omitted).  The *Duryee* court noted that this state law would implicate many national bank customers and that to comply with the law, a national bank would "have to limit its business with many if not most of its customers until it could generate sufficient business outside this restricted customer base to stay below the" maximum allowable percentage of certain types of customers.  *Id.* at 409.  The court found the Ohio statute to be preempted because it "significantly interfere[d]" with national banks' ability to exercise their power to sell insurance. *Id.* at 410.  It was in this context that the court rejected the state's argument that a state statute must "effectively thwart" national banks' powers to be preempted. (*See* Maj. Slip Op. 12.)  Again, however, this statute, which dictated the parties to whom national banks could sell insurance and threatened revocation of national banks' insurance licenses depending on the composition of their customers, rose to a much higher level of interference with national banks' business functions than Ohio's garnishment law does.

Thus, the cases cited by the majority offer limited guidance because they entail far more significant intrusions into the business of national banks than the statute before us.  The majority does not mention two cases raised by Monroe Retail in which the Supreme Court declined to find preemption with respect to state statutes similar to the one at issue here.  Those decisions held that such statutes are not preempted because they do *not* significantly impair national banks' functions.

In *Anderson National Bank v. Luckett*, 321 U.S. 233, 236 (1944), the Supreme Court found that a state law directing banks, both state and national, to "turn over to the

state, deposits which have remained inactive and unclaimed for a specified period" was not preempted by national banking laws. The Court stated: "This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Id*. at 248. With respect to the requirement that banks, including national banks, turn over abandoned funds, the Court stated: "It has never been suggested that non-discriminatory laws of this type are *so burdensome* as to be inapplicable to the accounts of depositors in national banks." *Id*. (emphasis added). We are not at liberty to ignore the holding of this binding authority. I doubt the majority would contend that if the state law at issue in *Luckett* had also specified that banks were required to turn over *all* of the abandoned property, without first deducting an "abandoned-property-turnover fee," like the one at issue in the present case, the *Luckett* Court would have changed course and deemed the state law to be preempted. *Luckett* was cited by the Supreme Court several months ago, and there is no indication that it is no longer good law. *See Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710, 2721-22 (2009). In light of *Luckett*, I fail to see how we can fairly hold that Ohio's garnishment law is preempted.

The Supreme Court engaged in similar analysis and reached the same result in *McClellan v. Chipman*, 164 U.S. 347, 358 (1896). In that case, a national bank argued that a federal statute that allowed national banks to accept real property in satisfaction of a debt preempted a state statute that forbade preferential transfers of property to creditors on the eve of insolvency. The Court rejected this argument, stating:

> [There is nothing] in the statutes of the State of Massachusetts, here considered, which in any way impairs the efficiency of national banks or frustrates the purpose for which they were created. No function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the State are subjected, one of which limitations arises from the provisions of the state law which in case of insolvency seeks to forbid preferences between creditors.

*Id.* This case, too, presents a much more analogous state law to the one under our consideration than any of the cases upon which the majority relies, further demonstrating that preemption should not apply here.

The above cases stand for the following proposition: a non-discriminating state law of general applicability that has an incidental effect on national banks but does not "frustrate[] the purpose for which they were created," *McClellan*, 164 U.S. at 358, "impose an undue burden on the performance of [their] functions," *Luckett*, 321 U.S. at 248, or "prevent or significantly interfere with the [] exercise of [their] powers," *Barnett*, 517 U.S. at 33, is not preempted by federal banking laws.

In its conclusion that Ohio's garnishment law does, in fact, rise to the level of such a significant burden for national banks, the majority begs the central question when it states that the garnishment law "'significantly interfere[s]' . . . with the Banks' ability to collect their service fees." No one disputes that. In fact, it does not just significantly interfere with their ability to collect garnishment fees—it forbids it. But the same was true of the law in *McClelland*, which forbade national banks from receiving preferences in violation of state law, and the law in *Luckett*, which forbade national banks from retaining abandoned funds claimed by the state. The real question—the one for which the majority has no persuasive answer—is how a restriction on national banks' ability to charge account service fees when turning over garnished funds to the rightful owner imposes an undue burden or significantly interferes with the banks' ability to function in their business as national banks. Clearly it does not. The only examples of hardship to which the majority points are the Banks' ability "to complete other transactions" and to "balance their accounts." These hardships are illusory: if the banks do not deduct a service fee on garnished funds, their concern about the order in which they deduct it disappears. And the Banks' inability to immediately "freeze" the garnished accounts because they "must first undertake a number of procedures to assess what funds are available to be garnished" is no cause for worry—no one is challenging their right to assess what funds are available, which bears no relation to their right to deduct some of the garnished funds for themselves.

**B.    The plain language of the savings clause weighs against preemption**

The Ohio garnishment statute fits within an explicit exception to preemption. *See* 12 C.F.R. § 7.4007(c). This savings clause lists a number of other areas of bodies of state law that, in addition to "rights to collect debts," are not preempted: contracts, torts, criminal law, acquisition and transfer of property, taxation, and zoning. All of these are laws of general applicability that incidentally affect, but do not target, national banks. The garnishment law at issue affects not only national banks, but state banks, employers, trustees—any entity that might be subject to a garnishment action. As the majority recognizes, and for the reasons stated in the majority's opinion, the banks' (and the OCC opinion letter's) argument that the savings clause refers only to *banks*' rights to collect debts is highly implausible.

**C.    Conclusion**

For the foregoing reasons, I believe the NBA does not preempt Ohio's garnishment law—a law of general applicability that, judging by the Supreme Court's jurisprudence, does not represent the kind of serious infringement on national banks' ability to function that would justify preemption. Therefore, I respectfully dissent.